Earl, J., in Herrman v. Insurance Co., 81 N. Y. 184, at page 188,. says:

"A dwelling house is unoccupied when no one lives therein, but is not then necessarily vacant. * * * To avoid the policy, the premises must not only be unoccupied, but also vacant. Force should be given to both words. This. is not a casual contract drawn in haste, in which language has been carelessly used; but it is a form of contract used by the defendant in its business,. probably adopted with great deliberation, every word of which, as we may suppose, has been carefully weighed."

These premises were both unoccupied and vacant. Herrman v.. Insurance Co., 85 N. Y. 162, 168, 169.

Plaintiffs made a breach of a binding condition, and must abide the unfortunate consequences. This being material error, judgment must be reversed, and a new trial granted. with costs to the appellant to abide the event. All concur.

---

(15 Misc. Rep. 632.)

### SCHREIBER v. DRIVING CLUB OF NEW YORK.

(City Court of New York,. General Term. February 7, 18. ..)

SURFACE WATER—DRAINAGE—NEGLIGENCE.

Where plaintiff's lands, at the time of a heavy rainfall, were flooded by waters flowing from defendant's lands, which had a sloping surface, and were lowest on the side adjoining plaintiff's, and there was evidence,. though conflicting, that the overflow of water was caused by defendant's negligence in digging ditches on its lands to drain a marsh in the higher part thereof, instead of allowing the water to flow down and spread over the lower land, and that defendant conducted the water to a culvert, which was considerably larger than the sewer pipe with which it connected, and which was insufficient to carry off the increased volume of water, a verdict for plaintiff should not be disturbed.

Appeal from trial term.

Action by Charles Schreiber against the Driving Club of New York for damages in causing plaintiff's lands to be overflowed with water. From a judgment entered on a verdict in favor of plaintiff,. and from an order denying a motion for a new trial, defendants appeal. Affirmed.

Argued before. VAN WYCK, C. J., and McCARTHY and. SCHUCHMAN, JJ.

Wm. G. McCrea, for appellants.

Thomas P. Byrne, for respondent.

SCHUCHMAN, J. This is an appeal from a judgment entered on the verdict of a jury in favor of the plaintiff, and against the defendants. No exception having been taken by either side to the charge of the court, it must be assumed to be correct. Appellants' attorney moved for a new trial on all the grounds specified in section 999 of the Code. Said motion was denied; an order was entered thereon; and an appeal was taken from said order. This brings up for review the evidence adduced at the trial, and although contradictory, if enough is contained therein to sustain the plaintiff's

cause of action (the jury being the sole judges of the facts of the case), the verdict must be sustained.

The plaintiff claims that while he was the lessee of some garden land between 164th and 165th street, west of Railroad avenue, of the city of New York, and while the defendants were the lessees of Fleetwood race track, which adjoined his land on the north, the defendants, by their carelessness or negligence or some wrongful act on their part, in not keeping the drainage on their land in proper shape, order, or repair, and in digging superficial ditches on their land, wrongfully accumulated water in such large quantities that the existing drainage could not carry it off, and thus threw it off on the plaintiff's adjoining lands, flooding them, and destroying his garden seeds, etc., to his damage.

The evidence established that on May 2 and 3, 1893, there was a heavy rainfall; that plaintiff's lands were flooded and damaged thereby.     The grounds of Fleetwood park in the northwest are higher than in the south and southeast.     There appear to be about three acres of wet meadow land in the northwest thereof, which is drained by the open drain or trench into eight acres of low wet meadow lands in the south.     There is also an old pond in the north, which was formerly drained by a stream known as "Low Ravine," southward into the old mill brook, but now drained into the culvert, which is of stone, 2 feet by 2 feet 6 inches, built in the southeasterly part of said park, and connects with an 18-inch pipe, carrying the water off into Webster avenue sewer.     In short, the drainage of the whole park is accomplished from its north and northeasterly upper lands to the south and southeasterly lower lands.     The evidence shows that the defendants, at some time, caused ditches to be dug in said park in order to drain the water from the upper part to the lower; that an old culvert in the park, opposite Grand avenue, was stopped up; that thereby a large quantity of water was carried down to the point where another culvert built in the south part of the park connected with an 18-inch pipe near Webster avenue, which pipe carried the water over into the Webster avenue sewer; that this last-mentioned culvert, being considerably larger than the 18-inch pipe with which it was connected, and carrying water from the east, and this additional water coming down from the upper western part, over these new-made ditches, exhausted the capacity of the 18-inch pipe to carry off all the quantities of water accumulating, and caused it to overflow and run southerly upon plaintiff's adjoining lowlands.

Mrs. Schreiber testifies:

"That on May 5th she went to see Mrs. Beile, at No. 1 Grand avenue, the first house next to the fence of Fleetwood park.  She looked out a side window in Mrs. Biele's house, and saw water in the park.  The water was at the clubhouse right opposite Mrs. Biele's house.  She saw a trench dug there.  She showed me the trench.  There was water in the upper pond (which was near there).  There was water in the trench.  It was running.  It was running down this way, into that ditch that got dug.  That ditch was made so that the water could run down to the lower pond.  It was a fresh-dug ditch. The ditch that was dug in the park ran from the track where the horses ran out of it down to the lower part of the ground.  It ran right through the trench that got dug open."

### Maling testifies:

"I am an hotel keeper. In 1893 kept the clubhouse in Fleetwood park. Kept it till the end of 1894. I saw one pond at the foot of the clubhouse, which is at the west side of Fleetwood park. I am only familiar with the upper pond. The water in the upper pond came from all over the hills, and some of it went into the sewer which is connected with the clubhouse; and, when a heavy rainfall came, it overflowed, and went into the pond under the track, into this upper pond. In this upper pond there was some sort of a cesspool. In 1893, about the time of the flooding of Schreiber's garden, they were digging a trench there. I saw them dig a trench. There is no pond there now. The water is drained off by this trench. I do not recollect how long the trench was there; it was over a year. I know that the trench was dug in the spring of 1893. That was the only trench that was dug that I saw."

### Mr. Thompson testifies:

"I am a civil engineer, and am employed in the department of street improvements in the 23d and 24th wards, and had charge of the building of the Webster avenue sewer. I have been in Fleetwood park, and have heard an upper pond testified here to-day. That would appear to be this plot of ground at Grand avenue, if it were shut off by an elevated ground like the race track. If the water was dammed back, it would necessitate the forming of that pond at that place, if the water accumulated there."

### Mr. Platz testified:

"I keep a hardware store, and live at 161st street and Cortlandt avenue. I was born in that neighborhood. Grand avenue is not quite the lowest point. I recollect the stream that flowed south there. I have seen the outside of Fleetwood park at Grand avenue, and have noticed an unused culvert that ran under the track. It is all stopped up now. That ran under the track into Grand avenue. On the other side of the track where the culvert ran was the upper pond. I noticed the ditch that had been dug there. That trench ran from about the center of the upper pond to the track, and along the inside of the track, down to the lower pond; and the pond opposite that, on Grand avenue, is where this unused culvert was stopped up. This culvert on Grand avenue is on the track property. I saw it inside the track fence. I could not see any culvert on the outside of the fence. It did come out before they filled up the avenue, but now it cannot, because the avenue is almost as high as the track is."

### Mrs. Beile testifies:

"I live in Grand avenue, near Fleetwood Park race track. My house is next to the fence, and I moved there in March, 1892. Mrs. Schreiber came to my house. I took her to the side window, and looked over into the race track with her. I showed her the water that was standing there. We saw the water and the gutter. I saw a man digging that gutter, and, before that trench was dug, I think there was more water there; how much water I do not know; very much when the trench was dug. The ditch was there when Mrs. Schreiber came, and I saw the man digging it."

### Mr. Guion, witness for the defendants, testifies:

"I examined this portion where they claim that this ditch was dug. A piece of land is drained by that ditch. I noticed ditches dug in the lower part of that tract of land, and did not display these ditches on the map, because Mr. McCrea said it was not necessary. There is a comparatively straight ditch running from the north side to the east end towards the culvert. It is about one foot deep. There is another straight ditch, which strikes the first ditch as the arm of a 'Y' would strike the upright. This trench in the upper ground is twelve inches wide, and about two feet deep. This same ditch runs along down the inside of the track, and empties into that lower basin. The only ditch in dispute that I knew of was this ditch dug here in the upper part of the track."

Mr. Moore testifies:

"The water began to run over to the east, and that suggested making a little ditch there, and we did make a little ditch to get the water off; and, when we got to the bottom of the ditch we made, we carried it a little further, and carried some more off; and we carried it that way until the water all worked off by degrees. I recollect the old drain that is under the track at Grand avenue, and I don't think it is stopped now. The track at Grand avenue is not on a level with the upper part. It is four feet higher."

Thus, it is established conclusively by the evidence of all the witnesses, as well on the part of the plaintiff as on the part of the defendants, that the old culvert on the track land opposite Grand avenue was stopped, and that some new ditches were dug in order to drain the upper track land.

As to the overflow caused at the southerly side of the track at the point where the culvert connected with the 18-inch pipe, and where the overflowing is asserted to have taken place, the evidence shows, in folio 53, that the water was coming out of that culvert, out from Fleetwood park, through a hole; and, in folio 111, Mr. Devlin says:

"I recollect the morning of May 3, 1893, when Mr. Schreiber's garden was flooded. I got there in the morning about half past six. I looked where the water was coming from. It was coming from the outside of Fleetwood park fence, out of a hole. That hole looked as if it was coming from Fleetwood park; that is, the culvert at the southeast corner of Fleetwood park; that is, the hole at the end of the culvert. [Exhibit D. shown witness.] The distance from the opening of this culvert to Schreiber's land is ninety feet. There is a stream of water running through the track that drains the ravine, and there is another stream that flows into Fleetwood park below that, through a culvert that drains a piece of meadow land extending up to 169th street, where it meets Webster avenue. North of the track is a high bluff, and all that falls on that would naturally flow that way south, and through this culvert."

Thus, it seems to be conclusively established that the water coming, in consequence of a heavy rainfall, from that whole race track down to the lowest southern part of it, was of such an enormous quantity that this culvert, which was of 2 feet and 6 inches where it connected with an 18-inch pipe, could not carry off all the flow of water, and naturally overflowed on plaintiff's adjoining land, and caused the damage; and it is further conclusively shown that the defendants were at fault when they increased this enormous quantity by drainage, by digging extra ditches, and instead of allowing water to come through the trenches from the upper pond, in which the water from the upper three acres of wet meadow land congregated, into the lower eight acres of meadow land, where the water could spread, it was, through these newly-dug ditches, carried down to this culvert, increasing the quantity of water, and causing the overflow. There was therefore evidence of a wrongful act committed on the part of the defendants, from which the jury could conclude that they contributed to the oveflowing, and caused the damage. The jury were the sole judges of the facts in the case, and of the credibility of the witnesses, and the appellate court cannot interfere therewith. It is true that it does not affirmatively appear by as convincing evidence as might be that these ditches were dug prior to the 2d or 3d of May, 1893. The defendants claim they were dug

within three or four days thereafter, but the act of the digging of the ditches and the damage done by the overflowing appear by the evidence to be so closely connected with each other that the jury had a right to infer that the damage was caused by these newly-dug ditches. Upon the facts as found by the jury, the case comes clearly within the law holding the proprietor liable for the damage caused by the increased flow of the water. Noonan v. City of Albany, 79 N. Y. 470.

The verdict should be sustained, and the judgment is affirmed, with costs. All concur.